**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FOR PUBLICATION**

---------------------------------------------------------------x
In re:

Chapter 7

Waterford Wedgwood USA, INC.,
*et al.*,

Case No. 09-12512 (SHL)

(Jointly Administered)

Debtors
---------------------------------------------------------------x
JOHN S. PEREIRA, as Chapter 7 Trustee for Waterford Wedgwood USA, Inc., Royal Doulton USA, Inc., Kilbarry Inc., Waterford Wedgwood Partners, Waterford Wedgwood, Inc., Waterford Wedgwood Holdings, Inc., WW Inc., Wedgwood USA, Inc., Waterford Wedgwood Finance, Inc., and Waterford Crystal Inc.,

Adv. No. 09-01910 (SHL)

Plaintiffs,

v.

WWRD US, LLC,

Defendant.
---------------------------------------------------------------x

**MEMORANDUM OF DECISION**

A P P E A R A N C E S :

KIRKLAND & ELLIS LLP
Attorneys for WWRD US, LLC
BY: Eric F. Leon
Nathaniel J. Kritzer
601 Lexington Avenue
New York, New York 10022

TROUTMAN SANDERS LLP
Attorneys for John S. Pereira
BY: John P. Camp
John S. Kinzey
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion (the "Motion") by Defendant WWRD US, LLC ("WWRD") seeking summary judgment on the fraudulent conveyance claim asserted against WWRD under 11 U.S.C. § 548 by John S. Pereira (the "Trustee"), as Chapter 7 Trustee for Waterford Wedgwood USA Inc., Royal Doulton USA, Inc., Kilbarry Inc., Waterford Wedgwood Partners, Waterford Wedgwood, Inc., Waterford Wedgwood Holdings, Inc., WW Inc., Wedgwood USA, Inc., Waterford Wedgwood Finance, Inc., and Waterford Crystal Inc. (together, the "Plaintiffs").

At the heart of the fraudulent conveyance claim is a transaction in which WWRD and certain non-U.S. affiliates (together "KPS")[1] purchased substantially all of the assets of Waterford Wedgwood PLC, a holding company and parent of the Plaintiffs ("PLC"). The Trustee contends that the simultaneous sale of the Plaintiffs' American assets to KPS was a fraudulent conveyance because the value of Plaintiffs' assets was more than the tax value ascribed to those assets in the sale documents. WWRD disagrees, contending that the sale of the American assets, together with the sale of the parent's assets, was part of an integrated transaction with a fair purchase price that was the result of a robust bidding process. WWRD contends that the integrated nature of these two sales is further reflected by the use of the sale proceeds to pay down a single secured creditor to which Plaintiffs and their parent were jointly liable. For the reasons set forth below, the Court agrees with WWRD that these sales constituted an integrated transaction and that the Plaintiffs received reasonably equivalent value for their assets. Accordingly, the Court grants WWRD's summary judgment motion and dismisses the Trustee's claim.

---

[1] WWRD and certain non-U.S. affiliates were newly formed companies or "acquisition vehicles" created by KPS Capital Partners, L.P ("KPS") to effectuate the purchase of substantially all of PLC's assets. Amended Consolidated Complaint ("Compl.") ¶ 15 (ECF No. 25); Answer and Affirmative Defenses of WWRD ("Answer") ¶ 15 (ECF No. 27). KPS is not a party to this adversary proceeding. *Id.*

## BACKGROUND

The relevant facts necessary for resolution of the Motion are undisputed. The Plaintiffs are all indirect subsidiaries of PLC. Compl. ¶16 (ECF No. 25); Answer ¶16 (ECF No. 27). Based in Ireland, PLC was the holding company for the worldwide manufacturing and distribution of crystal, china, and other products under brands including Waterford Crystal, Wedgwood and Royal Doulton.[2] *Id.* By 2008, PLC was on the verge of collapse after suffering significant losses of revenue and income. Compl. ¶ 21; WWRD Statement of Undisputed Facts ¶ 2 ("WWRD Stmnt") (ECF No. 62). PLC sought potential investors and buyers for its business. WWRD Stmnt. ¶ 2; Trustee's Counterstatement of Facts ¶ 7 ("Counterstatement") (ECF No. 68).

### A. The Marketing Process

After a failed attempt in 2008 to raise capital through a rights offering, PLC retained Lazard Frères & Co. ("Lazard") to solicit potential investors and buyers for PLC.[3] *See* WWRD Stmnt. ¶ 2 (ECF No. 62); Counterstatement ¶ 7 (ECF No. 68). Lazard initially contacted 182 potential investors. Deloitte "Sale of Business" Presentation, dated Jan. 29, 2009, ("Presentation") at 3 (Leon Decl. Ex. D., ECF No. 65-5). Two of these, KPS and Golden Gate Capital, progressed past the preliminary interest stage. *Id*. Golden Gate Capital indicated it would not be willing to invest without a bankruptcy process, leaving only KPS. *Id.*

---

[2] WWRD refers to the global group of affiliates and brands held by PLC as Waterford Wedgwood, and the Court shall do the same.

[3] WWRD stated that Lazard was retained to solicit bids from potential buyers. WWRD Stmnt. ¶ 2 (ECF No. 62). The Trustee disputes this fact, asserting that Lazard was retained to find investors to inject additional equity into the business. Counterstatement ¶ 7 (ECF No. 68); CBIZ Report, dated March 25, 2009, at 15, (Campo Decl. Ex. 5, ECF No. 71-5). There can be no dispute that Lazard contacted many entities, including KPS, regarding investment in or purchase of PLC. *See* Presentation at 3, 5 (ECF No. 65-5); Michael Psaros Deposition, dated March 28, 2012, at 7:9-8:3 ("Psaros Dep.") (Leon Decl. Ex. B, ECF No. 65-3). Subsequently, Deloitte and JPM Cazenove obtained expressions of interest and contacted potential buyers using, among other things, the bids originally solicited by Lazard. *Id.* Although the Trustee disputes the nature of Lazard's initial retention, the Trustee has not demonstrated that this fact is material to the outcome of this case, nor does the Court find it to be material. For example, the Trustee does not assert that the process to find a purchaser was somehow untrustworthy or unreliable because Lazard had initially solicited investors.

In January 2009, PLC commenced insolvency proceedings in Ireland and the United Kingdom. Compl. ¶ 25 (ECF No. 25). At that time, Deloitte was appointed as administrator in the United Kingdom and receiver in Ireland, serving on behalf of the senior secured creditors. Presentation at 3 (ECF No. 65-5); Notice of Appointment of Administrator ¶ 1 (Joint Letter regarding Foreign Insolvency Proceedings, dated Jan. 23, 2013, Ex. A, ECF No. 77). Deloitte followed up on Lazard's efforts and identified "alternative bidders . . . to ensure that the market ha[d] been thoroughly tested and to confirm that no better offers [were] available [than] that offered by KPS." Presentation at 3 (ECF No. 65-5). Deloitte obtained 78 expressions of interest in the whole or part of the business. *Id.* at 5. Of these, Deloitte identified eight "serious" potential bidders for the whole business, and eventually narrowed this to three parties with the greatest potential to complete a transaction. *Id.* at 5-7. Simultaneously, JPM Cazenove was appointed as part of the M&A team to utilize its own network and identify other potential buyers. *Id*. at 3, 5-7. As of January 2009, JPM Cazenove had contacted 55 parties identified as having potential interest. *Id.*

Deloitte considered the KPS bid as one for the "whole business" and did not receive any serious offers for individual divisions of the business. *See* Presentation at 10 (ECF No. 65-5); *see also* CBIZ Report at 32 (ECF No. 71-5) ("There were no other substantial offers that would have separately added up to a greater value than the KPS deal."). Indeed, Deloitte had concluded that "[a] transaction at [a] divisional level [would have] required separation issues to be addressed, particularly in relation to USA sales and distribution." Presentation at 10 (ECF No. 65-5).

At the end of the marketing process, Deloitte chose KPS as the highest and best bidder, accepted KPS's offer to purchase the global business for €107.5 million, and entered into a sale

with KPS (the "KPS Transaction"). *See* Share and Business Sale Agreement §3.1.2 ("Main Agreement") (Leon Decl. Ex. A, ECF No. 65-1); LePatner Decl. ¶ 3 (ECF No. 64).

**B. <u>The Sale</u>**

The KPS Transaction was completed through two agreements, the Share and Business Sale Agreement (the "Main Transaction Agreement") and the Asset Purchase Agreement (the "U.S. Sale Agreement").[4] WWRD Stmnt. ¶¶ 13-19 (ECF No. 62). The U.S. Sale Agreement accomplished the sale of Waterford Wedgwood's U.S. assets. WWRD Stmnt. ¶ 14; Counterstatement at 3 (ECF No. 68). The Plaintiffs were all sellers under the U.S. Sale Agreement. *See* Asset Purchase Agreement ("U.S. Agreement") (Leon Decl. Ex. C., ECF No. 65-4). The Main Transaction Agreement effected the sale of Waterford Wedgwood's other global assets, including the Waterford, Wedgwood, and Royal Doulton assets in the United Kingdom and Canada, intellectual property in Ireland, and shares of certain Waterford Wedgwood subsidiaries including in Japan, Indonesia, Hong Kong, Taiwan, Singapore and Australia. LePatner Decl. ¶ 3 (ECF No. 64).

The U.S. Sale Agreement included, as an express condition to closing, that the Main Transaction must be consummated "substantially contemporaneously with the closing." U.S. Agreement § 7.01(a) ( ECF No. 65-4). The U.S. Sale Agreement would not impose any obligations on either buyer or sellers unless the Main Transaction closed on or prior to the closing date of the U.S. Sale Agreement. *See id.* at §§ 7.01(a), 7.02(a)). The Main Transaction

---

[4] WWRD contends that two sales agreements were used because the U.S. entities were not parties to the insolvency proceedings in the U.K. and Ireland, thus necessitating a separate sale agreement for the U.S. assets. WWRD Stmnt. ¶ 14. The Trustee disputes this explanation, claiming that the two agreements demonstrate that the U.S. Sale was a separate, independent transaction. Counterstatement at 3 (ECF No. 68); Memorandum in Opposition to Motion at 15 ("Opp.") (ECF No. 67). In any event, it is undisputed that there are two agreements. And for reasons discussed below, the Court disagrees with the legal conclusion that Trustee draws from this undisputed fact.

was similarly conditioned on "the substantially contemporaneous completion of the transactions contemplated under the U.S. Sale Agreement . . . ." Main Agreement § 5.1.5 (ECF No. 65-1).

KPS closed both transactions on March 26, 2009, thereby acquiring the Plaintiffs' U.S. assets and Waterford Wedgwood's global assets in nine other countries. LePatner Decl. ¶¶ 3-4 (ECF No.64). At the time of closing, a single purchase price of €107.5 million for the global acquisition was paid with a single wire transfer. *Id.* at ¶ 4. No individual payments were made for any of the individual assets purchased by KPS in the global transaction. *Id.*

At the time it acquired Waterford Wedgwood, KPS valued "the business on a global basis" and did not perform any analysis of the value of the U.S. assets or the assets in any other specific jurisdiction. Deposition of Evan LePatner, dated March 28, 2012, at 12:24-13:8 ("LePatner Tr.") (Leon Decl. Ex. F, ECF No. 65-7) ("We didn't think about [the value in] any one jurisdiction independent from the rest of the company."). WWRD and the sellers agreed for tax purposes, however, to allocate the total purchase price of €107.5 million for the KPS Transaction among the various geographical jurisdictions where the assets were located. LePatner Tr. 23:25-24:4 (ECF No. 65-7). The parties allocated €25 million to the assets of Waterford Wedgwood USA and Royal Doulton USA. *See* U.S. Agreement at Schedule 6 (ECF No. 65-4); *see also* Purchase Price Allocation Schedule (Leon Decl. Ex. H, ECF No. 65-11).

**C. <u>The Global Debt</u>**

PLC and certain of its affiliates, including several of the Plaintiffs, were parties to a Facility Agreement (the "Facility") with Bank of America ("BofA") as lender and agent bank. *See* Facility Agreement at Schedule I (listing several Plaintiffs as original borrowers and obligors) (Campo Decl. Ex. 2, ECF No. 71-2). The Facility provided two tranches of loans. *Id.* at §§ 2.1-2.4. The senior tranche was a combination of term loans secured by real property,

equipment, inventory, and accounts receivable, all totaling €200 million. *Id.*; *see also* Facility Agreement at Schedule II, Part II (describing security). The Facility was also secured by $25 million cash collateral, which had been deposited by the principals of PLC. *See* Counterstatement ¶ 3 (citing generally Facility Agreement) (ECF No. 68). The Facility's second level, Tranche B, consisted of $60 million at effectively junk bond interest rates. Facility Agreement §2.4. Tranche B was secured by the same assets, but was subordinated to the first tier of the Facility. *Id.; see also* CBIZ Report at 8-9 (ECF No. 71-5). Prior to the creation of the BofA Facility, PLC had issued secured bonds in the amount of approximately $200 million, which were subordinated to PLC's bank debt. CBIZ Report at 9 (ECF No. 71-5).

The borrowers under the Facility cross-guaranteed repayment of the total amount of loans outstanding under the Facility. Compl. ¶ 20 (ECF No. 25); Facility Agreement at 70, 125-26 (ECF No. 71-2). In addition, the borrowers and other PLC affiliates, including several Plaintiffs in this case,[5] guaranteed payment of all amounts outstanding under the Facility and pledged essentially all of their assets to secure these obligations. Compl. ¶¶ 20, 35 (ECF No. 25); Facility Agreement at 70, 125-26 (ECF No. 71-2). Contemporaneously with the formation of the Facility, BofA entered into an intercreditor agreement, which provided that would BofA serve as the security agent for all of the secured lenders. *See* Intercreditor and Security Trust Agreement (Campo Decl. Ex. 3, ECF No. 71-3); *see also* CBIZ Report at 10 (ECF No. 71-5). Pursuant to that agreement, BofA would apply the proceeds of any realization on their common collateral first to the senior level of the Facility, then to repay Tranche B, and finally to pay off the bonds. *Id*.

At the time of the KPS Transaction, the book value of the secured debt to BofA was at

---

[5] Waterford Wedgwood USA, Inc. and Royal Doulton USA Inc. were original borrowers and guarantors under the Facility. Facility Agreement at 125-126 (ECF No. 71-2). Waterford Wedgwood Inc., Waterford Wedgwood Holdings, WW Inc., and Waterford Wedgwood Finance were original guarantors under the Facility. *Id.*

least €344,821,000, more than three times the €107.5 million purchase price paid by WWRD. CBIZ Report at 12 (ECF No. 71-5). As the Plaintiffs' senior creditor, BofA had priority over all proceeds from the sale of Waterford Wedgwood's assets. *Id.* at 8-9. All net proceeds from the KPS Transaction—roughly €82 million—went directly towards satisfying the globally secured antecedent debt for which all the Waterford Wedgwood entities, including but not limited to the Plaintiffs, were liable. LePatner Decl. ¶ 3 (ECF No. 64); CBIZ Report at 34 (ECF No. 71-5). As a result, BofA holds a secured claim for $221 million against each one of the Plaintiffs. *See* Schedule Ds (Leon Supp. Decl. Ex. I, ECF No. 73).

**DISCUSSION**

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986); *Mark IV Indus. v. N.M. Envtl. Dep't* (*In re Mark IV Indus.*), 438 B.R. 460, 464–65 (Bankr. S.D.N.Y. 2010). A material fact is one that "might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and quotations omitted). After the movant has made its initial showing, the opposing party must present competent evidence that a genuine issue of fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (noting that after moving party has met its burden under Rule 56(c), opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts"). Mere conclusory allegations or unsupported speculations will not defeat a motion for summary judgment. *See id.* If the nonmoving party fails to establish the existence of an element essential to its case on which

it will bear the burden of proof at trial, summary judgment should be granted in favor of the movant. *Celotex*, 477 U.S. at 322–23.

Section 548 of the Bankruptcy Code states in part, "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1). Thus, a successful fraudulent conveyance claim requires proof of four elements: (1) the debtor must have an interest in the property; (2) the transfer occurred within two years of the filing of bankruptcy; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the debtor received less than a reasonably equivalent value for the interest transferred. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994). A trustee seeking to avoid the transfer bears the burden of proof. *In re Big Apple Scenic Studio, Inc.*, 63 B.R. 85, 89 (Bankr. S.D.N.Y. 1986); *In re North American Dealer Group, Inc.*, 62 B.R. 423, 428–29 (Bankr. E.D.N.Y. 1986); *Bracaglia v. Manzo* (*In re United Stairs Corp.*), 176 B.R. 359, 371 (Bankr. D.N.J. 1995).

The parties do not dispute that a transfer occurred within two years of filing the petition involving property in which the Plaintiffs had an interest. Nor is there any dispute that the Plaintiffs were insolvent. At issue here is whether the Plaintiffs received reasonably equivalent value for the transfer. WWRD contends that the transfer of assets should be considered part of one integrated transaction, and that the value given for the entire transaction was fair. The Trustee denies that this is a global transaction, and argues the Court must instead look only at the value of the Plaintiffs' American assets and that the value given was not fair. Thus, to decide this motion for summary judgment, the Court must make two determinations: (1) whether the

sale of Plaintiffs' assets was part of an integrated transaction for the sale of all of Waterford Wedgwood's global business; and (2) whether WWRD conveyed reasonably equivalent value in the transaction.

**A. <u>The KPS Transaction was an Integrated Transaction</u>**

The integrated transaction doctrine, also referred to as the step transaction doctrine, is most commonly used in tax law. *See e.g., Commissioner v. Clark*, 489 U.S. 726, 738 (1989); *Salomon Inc. v. United States*, 976 F.2d 837, 842 (2d Cir. 1992); *True v. United States*, 190 F.3d 1165, 1173-74 (10th Cir. 1999). "Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Clark*, 489 U.S. at 738. Courts have applied this same principle in bankruptcy cases, often referring to it as "collapsing transactions." *See Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993); *HBE Leasing Corp, v. Frank*, 48 F.3d 623, 635-36 (2d Cir. 1995); *In re Old CarCo LLC*, 435 B.R. 169, 185 (Bankr. S.D.N.Y. 2010); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002).

In the bankruptcy context, collapsing transactions commonly arises in leveraged buyout cases. *See HBE Leasing*, 48 F.3 at 635 and cases cited therein. "The paradigmatic scheme is . . . [that] one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing." *Id.*

Collapsing transactions is compatible with fraudulent conveyance principles as both emphasize substance over form. *See* 5-548 Collier on Bankruptcy P 548.03 ("Fraudulent transfer

law has always exalted substance over form."); *Salomon*, 976 F.2d at 842 (collapsing two steps of transaction for tax purposes because "in substance, if not in form, the [two transactions] are the same . . . distinguish[ing] between them would deny economic reality"). "[F]raudulent conveyance doctrine . . . protects creditors from any transactions the debtor engages in that have the effect of impairing their rights, while ensuring that the debtor can continue to do business and assuring third parties that transactions done with the debtor at arm's length will not be second-guessed." 5-548 Collier on Bankruptcy P 548.03 (citing *Boyer v. Crown Stock Dist., Inc.*, 587 F.3d 787, 792 (7th Cir. 2009)). The "real test of a fraudulent conveyance . . . is the unjust diminution of the debtor's estate." *See Orr*, 991 F.2d at 36 (quoting 1 Garrant Glenn, Fraudulent Conveyances and Preferences § 195, at 348 (rev. ed. 1940)). In essence, the Court may consider the net effect of a multi-step transaction. *Id.*

This parallels the "end result" test used in the tax context to determine whether the integrated transaction doctrine applies.[6] "The end result test combines 'into a single transaction separate events which appear to be component parts of something undertaken to reach a particular result.'" *True*, 190 F.3d at 1175 (quoting *Kornfeld v. C.I.R.*, 137 F.3d 1231, 1235 (10th Cir. 1998); *Associated Wholesale Grocers*, 927 F.2d at 1523); *see also Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994). If the various closely related transactions are just means to reach a particular result, the court will view them as a single transaction. *Kanawha Gas & Utils. Co. v. Comm'r*, 214 F.2d 685, 691 (5th Cir. 1954).

[6] Courts have applied three tests to determine whether the integrated transaction doctrine should apply to collapse multiple transactions into one: (1) the end result test, (2) the interdependence test, and (3) the binding commitment test. *True*, 190 F.3d at 1174–75 (10th Cir. 1999); *Associated Wholesale Grocers, Inc. v. U.S.*, 927 F.2d 1517, 1522 (10th Cir. 1991); *Big V Supermarkets Inc. v. Wakefern Food Corp.* (*In re Big V Holding Corp.*), 267 B.R. 71, 92 (Bankr. D. Del. 2001). Only one of the tests needs to be satisfied to apply the doctrine. *True*, 190 F.3d at 1175.

Here, the Court finds it appropriate to collapse the two sales agreements and treat them as one integrated transaction. In doing so, the Court is mindful that it need not adhere to labels assigned by the parties, but rather can consider the intent of the parties in structuring the transaction. S*ee, e.g.*, *In re Best Prods. Co.*, 157 B.R. 222, 229-30 (Bankr. S.D.N.Y. 1993) (ignoring formal structure assigned by parties and looking instead at their intent). It is undisputed that the sale of the American assets was effected only as part of the overarching sale of the global assets. Although the U.S. assets were sold pursuant to a separate sale agreement, the U.S. Sale Agreement expressly provided that it should be consummated "substantially contemporaneously" with the closing of the Main Transaction. The Main Transaction was similarly conditioned on the completion of the U.S. Sale. These conditions in both agreements make clear that the parties intended an integrated transaction. Moreover, they make clear that the sale of the U.S. assets would not have occurred on its own. During the marketing process, Deloitte only moved forward with serious bids for the entire business. The effect of the two sale agreements was that WWRD purchased substantially all of the Waterford Wedgwood assets. Indeed, all the assets under both agreements were sold for one purchase price delivered in a single wire transfer. Based on these facts, WWRD has made an initial showing that the KPS Transaction was one integrated transaction. *See Old CarCo*, 435 B.R. at 185 ("[B]ecause the deal documents themselves make clear that the entire transaction is linked, collapsing of the constituent elements is not an issue."); *In re Hechinger Investment Co. of Delaware*, 327 B.R. 537, 547 (considering many steps as one transaction where "[e]ach step of the Transaction would not have occurred on its own, as each relied on additional steps to fulfill the parties' intent and merge [the two companies]").

The burden then falls on the Trustee to present competent evidence that a genuine issue of fact exists. *Matsushita*, 475 U.S. at 586–87. The Trustee has failed to do so. The only fact the Trustee relies upon is that the Plaintiffs' assets were sold pursuant to a separate sale agreement. However, the Trustee's own expert conceded that the Plaintiffs' assets were not sold or marketed on "a stand-alone basis," but rather "as part of a global transaction for the entire Waterford Wedgwood business." William K. Lenhart Deposition, dated Aug. 16, 2012, at 34:11-20; 47:22-48:2 ("Lenhart Dep.") (Leon Decl. Ex. E., ECF No. 65-6). Indeed, there is nothing about the existence of a separate sales agreement here that raises a material issue of fact, particularly given the language in the two agreements conditioning each on the execution of the other. The Trustee's argument is further undermined by the end result of the Main Transaction and the U.S. Sale, which was to pay down the secured debt owed to BofA jointly by all the entities whose assets were being sold under the two agreements, including but not limited to the Plaintiffs and PLC.

The Trustee argues that the relevant case law on the integrated transaction doctrine all involves multiple transactions by the same debtor. *See* Opp. at 14 (ECF No. 67). As a threshold matter, the Court can see no reason why this would preclude application of the doctrine if the substance of the relevant transactions satisfied the legal requirements. The Trustee cites no case that so holds. Moreover, several cases in this district have applied the integrated transaction doctrine when multiple entities were involved. *See Old CarCo*, 435 B.R. at 185-86; *Sunbeam Corp.*, 284 B.R. at 370. In *Old CarCo*, for example, former Chief Judge Gonzalez treated multiple transfers by a foreign parent company, Daimler AG, and its U.S. subsidiaries as one global sale of the controlling share in Chrysler. *Old CarCo*, 435 B.R. at 185. Daimler AG successfully dismissed the fraudulent conveyance claim against it by showing that the plaintiffs'

allegations did not include monetary contributions and other value received by the debtor. *Id.* at 187. Thus, the court in *Old CarCo* applied the integrated transaction doctrine even though the case involved transfers by both a United States debtor and its overseas parent.

**B. <u>Plaintiffs Received Reasonably Equivalent Value</u>**

Moving on to the second inquiry before the Court, the Trustee must prove that the debtor received "less than reasonably equivalent value" for the transfer to be avoided as a fraudulent conveyance under Section 548 of the Bankruptcy Code. 11 U.S.C. § 548(a)(1)(B)(i); *BFP*, 511 U.S. at 535. Of the three terms "reasonably equivalent value," only 'value' has a definition, and is defined as "property, or satisfaction of a . . . present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A); *BFP*, 511 U.S. at 536. A guaranty is an antecedent debt, and thus courts recognize that payment on account of a pre-existing guaranty constitutes value. *Silverman v. Paul's Landmark, Inc.* (*In re Nirvana Rest.*) 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006).

In contrast to its definition of "value," Congress left it to the courts to mark the scope and meaning of the term "reasonably equivalent." *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990). To determine reasonably equivalent value, courts examine the totality of the circumstances surrounding the transfer in question. *Id.* at 467; *see also Pereira v. Wells Fargo Bank, N.A.* (*In re Gonzalez*), 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006). "The 'totality of the circumstances' inquiry considers three factors: (i) the fair market value of the economic benefit received by the debtor; (ii) the arms-length nature of the transaction; and (iii) the good faith of the transferee." *Gonzalez*, 342 B.R. at 173 (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.* (*In re R.M.L.*), 92 F.3d 139, 149 (3d Cir. 1996)); *see also Morris Communications*, 914 F.2d at 467. Because fraudulent conveyance laws are intended to protect a debtor's creditors, the analysis of

reasonable value must be determined from the creditors' standpoint. *See Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002) (quoting *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991)).

The value received by a debtor does not need to be a "penny for penny exchange," but can be "'roughly' the value of the transfer made." *Gonzalez*, 342 B.R. at 173. The value is presumptively less than a reasonably equivalent value if it is "so low that it shocks the conscience." *Id.* Courts give "significant deference to marketplace values" and to values reached in the context of "an arm's length transaction between a willing buyer and a willing seller." *See Peltz*, 279 B.R. at 737-38. The fair market value is equivalent to the winning bid accepted at an auction. *See In re Nextwave Personal Communications, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999); *Balaber-Strauss v. Murphy* (*In re Murphy*), 331 B.R. 107, 120 (Bankr. S.D.N.Y. 2005) (absence of competitive bidding precludes presumption that reasonably equivalent value was received). "Absent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007).

Here, WWRD has shown that the sale was the product of a robust bidding process to obtain fair market value. Lazard solicited bids from 182 potential investors, Deloitte obtained 78 expressions of interest in purchasing either the entire business or part of it, and JPM Cazenove contacted 55 of those parties. Eight serious potential bidders expressed interest in the whole business. KPS submitted the highest and best bid, which was an offer to purchase the global business for €107.5 million. Deloitte accepted KPS's bid and entered into the sale with KPS. Absent some reason to distrust the bidding process, KPS's winning bid establishes that the

transfer of the global assets was exchanged for reasonably equivalent value. *Nextwave*, 200 F.3d at 56; *Murphy*, 331 B.R. at 120; *Campbell Soup*, 482 F.3d at 633.

The Trustee has not presented any evidence that provides a basis to disavow the results of this bidding process. The Trustee's pleadings contain various musings about the sales process. *See e.g.*, Opp. at 10 (ECF No. 67) (stating that "efficacy" of efforts to market assets after receiver and joint administrator were appointed are "open to question"); *Id*. at 17 ("the sales process used in this case may not have been the sort of orderly, systematic process that would result in a market-driven maximized price for PLC's global assets."). But such unsubstantiated speculation is insufficient to defeat summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *Compuware Corp. v. Innovatec Communications*, 2005 U.S. Dist. LEXIS 45621 (E.D.Wis. Aug. 24, 2005) (rejecting trustee's attempt to "poke holes in the auction process" and noting that trustee failed to identify specific facts that would have led to a higher price). Indeed, the Trustee's expert was not aware of any evidence to suggest there was not a robust sales process. Lenhart Dep. 55:24-56:5 (ECF No. 65-6). Nor has the Trustee's expert disputed that the KPS Transaction resulted from arm's length negotiations. *Id*. at 58:18-23 (the Trustee's expert was not aware of any reason to believe negotiations were not conducted at arm's length). Finally, the Trustee has not presented competent evidence to demonstrate that the purchase price of €107.5 million was less than reasonably equivalent value. *Peltz*, 279 B.R. at 738 ("it is not the place of fraudulent transfer law to reevaluate or question [marketplace] transactions with the benefit of hindsight"). In sum, the Trustee has not shown that a genuine issue of fact exists regarding whether the overall purchase price was reasonably equivalent value. *See In re M.*

*Silverman Laces*, 2002 WL 31412465, *6 (S.D.N.Y. Oct. 24, 2002) (affirming grant of summary judgment where defendant received reasonably equivalent value as a matter of law).[7]

Similarly, the Trustee is misguided in arguing that the Plaintiffs did not receive a fair share of the purchase price or that the Plaintiffs' unsecured creditors were prejudiced. The Trustee's position overlooks the undisputed facts. The Plaintiffs and their global affiliates, including corporate parent PLC, were liable to BofA for the outstanding amounts owed under the Facility. As a secured lender under the Facility, BofA had priority over all proceeds from the sale. The balance due under the Facility was more than three times the purchase price received for the global assets in the integrated sales transaction. As such, the Plaintiffs could not – and did not – receive any value other than the partial payoff of the Waterford Wedgwood group's global creditor, BofA, regardless of the artificial tax value attributed to the Plaintiffs' U.S. assets. As the proceeds of the KPS Transaction were used to pay down the Plaintiffs' globally secured debt, this constitutes value under Section 548(d)(2)(A). *Nirvana Rest.*, 337 B.R. at 502 (payment on a guaranty is satisfaction of antecedent debt). Moreover, the BofA secured debt was not paid in full, leaving BofA with a secured claim in this bankruptcy for $221 million against each one of the Plaintiffs. *See* Schedule Ds (ECF No. 73). The unsecured creditors did not suffer prejudice because they did not stand to recover any of the proceeds of the sale unless BofA's secured claim was paid in full.

In evaluating the question of reasonably equivalent value here, the Court also cannot overlook that the reduction in Plaintiffs' secured debt as a result of the integrated transaction was €82.1 million**,** which greatly exceeds the Trustee's own valuation of the Plaintiffs' assets on a

---

[7] The Trustee contends that it is a disputed fact whether PLC received fair value from the sale of Plaintiffs' assets in the United States. *See* Opp. at 16-17 (ECF No. 67). But as the Court has collapsed the Main Transaction and the U.S. Sale into one transaction, the value of the U.S. assets alone is not relevant. Rather, the question is whether PLC received fair value for its global assets and whether the Plaintiffs received reasonably equivalent value from the proceeds of that sale. The Court concludes that the answer to both questions is yes.

stand-alone basis. *Compare* CBIZ Report at 34 (ECF No. 71-5) (effective balance paid to Senior Lenders was €82,134,000.00, or approximately $109 million), *with* Opp. at 12 (ECF No. 70) (Trustee's expert estimates fair value of Plaintiffs' assets were approximately $65.9 million).[8]

Based on the foregoing, the Court finds that the sale proceeds partially satisfied an obligation of the Plaintiffs, thus providing value to the Plaintiffs, and that the undisputed bidding process establishes that the value was fair. Accordingly, the Court finds that Plaintiffs received reasonably equivalent value in exchange for their assets.

**CONCLUSION**

For all the reasons set forth above, WWRD's summary judgment motion is granted. The Defendant is directed to settle an order on five days' notice.

Dated: New York, New York
October 31, 2013

***/s/ Sean H. Lane***
UNITED STATES BANKRUPTCY JUDGE

[8] In comparing the reduction of secured debt measured in euros to the valuation of the Trustee's expert in dollars, the Court takes judicial notice of the general conversion rate between these two currencies at the time of the transaction. *See* Fed. R. Evid. 201 (providing that a court may take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (concluding that district court may take judicial notice of information on an official government website). To convert from a foreign currency to U.S. dollars, one must "divide the foreign currency amount by the applicable yearly average exchange rate . . . ." *Yearly Average Currency Exchange Rates*, http://www.irs.gov/Individuals/International-Taxpayers/Yearly-Average-Currency-Exchange-Rates (last updated Sept. 27, 2013). The Internal Revenue Service reports the yearly average exchange rate to convert U.S. dollars to Euros was roughly 0.748 in 2009. *Id.*